UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AWILDA R. RIVERA,                                  :

                     Plaintiff,                    :                    15 Civ. 3857(AJP)

         -against-                         :           **OPINION AND ORDER**

CAROLYN W. COLVIN, Commissioner of                 :
Social Security,
                                                   :
            Defendant.
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Awilda R. Rivera, represented by counsel, brings this action pursuant to §

205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the

Commissioner of Social Security denying her Social Security Supplemental Security Income

("SSI"). (Dkt. No. 1: Compl.) Presently before the Court are the parties' cross-motions for judgment

on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 12: Rivera Notice of Mot.; Dkt. No.

14: Comm'r Notice of Mot.) The parties have consented to decision of the case by a United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 8.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 14) is <u>GRANTED</u> and Rivera's motion (Dkt. No. 12) is <u>DENIED</u>.

**<u>FACTS</u>**

**<u>Procedural Background</u>**

        Rivera applied for SSI on December 29, 2010, alleging disability since August 1,

2010. (Dkt. No. 11: Administrative Record ("R.") 170-76.) The Social Security Administration

("SSA") denied Rivera's application on February 9, 2011.  (R. 89-92.)  On November 28, 2011, Rivera had a hearing before Administrative Law Judge ("ALJ") Kenneth G. Levin.  (R. 56-71.)  On December 8, 2011, ALJ Levin issued a written decision finding Rivera not disabled.  (R. 73-84.)

On June 6, 2013, the Appeals Council vacated ALJ Levin's decision, and remanded the case for a new hearing.  (R. 85-88.)  ALJ Jerome Hornblass conducted that hearing on November 19, 2013 (R. 43-55), and Rivera appeared with attorney Ryan Petersen (R. 42-46).  On January 29, 2014, ALJ Hornblass issued a written decision finding Rivera not disabled.  (R. 20-40.)  ALJ Hornblass' decision became the Commissioner's final decision when the Appeals Council denied review on March 25, 2015.  (R. 1-3.)

## Non-Medical Evidence and Testimony

Rivera, born on May 14, 1964, was forty-six years old at the alleged August 1, 2010 onset of her disability.  (R. 170.)  At the time of Rivera's first hearing, she was living in an apartment with her son (R. 62), and at the time of her second hearing she was living in a shelter with her son and grandfather (R. 47).  Rivera attended school through the tenth grade, and began special education classes at fifteen because she is "a little slow" and has a "touch of ADHD."  (R. 48, 63, 385.)  Rivera does not read or write well (R. 48-49), but for enjoyment she reads the dictionary, baby books and the Bible (R. 64, 201).  Rivera's hobbies are reading, cooking, watching television and playing card games, all of which she does daily, but she performs these activities more slowly since the onset of her condition.  (R. 206.)  Rivera has difficulty understanding television shows.  (R. 68.)  Rivera is able to follow written instructions and finish what she starts, but has difficulty following spoken instructions. (R. 208.)  Rivera does not trust people and becomes nervous in large groups. (R. 206.)  Rivera interacts socially with her pastor and family members, and she goes on her son's school trips with him.  (R. 206.)  Rivera goes to church weekly, taking the train.  (R. 65, 206.)

Rivera goes shopping once every two weeks to purchase food, toiletries, school supplies and clothes. (R. 204.)  Rivera is able to pay bills (R. 204) and count money, but since the onset of her condition, counting money takes her longer than it previously did and she needs to recount several times (R. 206).

Each day Rivera wakes up around six a.m. and gets her son ready for school.  (R. 201.)  Rivera spends the day going to appointments and returns to the shelter around 3 p.m.  (R. 201.)  Rivera travels independently (R. 50, 63, 204, 231, 289), but needs to ask for directions on the subway when she gets confused (R. 63, 66).  Rivera is assigned a "Domestic Partnership person" through her shelter, to help her "get around" and take her to appointments.  (R. 50-51.)  Rivera sometimes does household cleaning and laundry without assistance (R. 66-67, 203), but her son helps her carry things, and she needs to be reminded of how much soap to use in the laundry and what to purchase at the grocery store (R. 66-67).  In the evening, Rivera prepares dinner and eats with her son, then plays games with him.  (R. 201.)  When Rivera's son goes to bed at 9 p.m., she sets out his clothes for the next day, reads the Bible and goes to sleep at 10 p.m.  (R. 201.)  Rivera takes care of her son by preparing his meals, buying his clothes, taking him to the doctor (R. 47-48), reading to him and helping with his homework (R. 202).  Rivera also attends parent-teacher conferences at her son's school, but she requires a room to herself because "everybody screaming and hollering and fighting" makes her "more tense."  (R. 53.)  Rivera visits her aunt (R. 64-65) and is close with her uncle (R. 231).

Rivera was molested as a teenager and has auditory hallucinations that feel "like the person that was molesting [her is] still in [her] possession."  (R. 53.)  Rivera also has difficulty falling asleep and staying asleep (R. 202), and wakes up at 3 a.m. "screaming" and "hollering" (R. 68).  Rivera began seeing a psychiatrist, Dr. Salim, in 2010 and in November 2011 she began seeing

Dr. Salim weekly.  (R. 59.)[1/]  Rivera testified that Dr. Salim prescribed her medication because she was not "functioning right. [She] wasn't doing anything right. [She] couldn't . . . do things by [herself]. [She] used to sit in depressed and sit in the corner and bang [her] head against the wall." (R. 51.)  The medication prescribed by Dr. Salim helped Rivera, and while she took it she was able to sleep and eat.  (R. 51.)  At the time of her hearing before ALJ Hornblass, Rivera had been taken off her medication but was planning to get back on it.  (R. 51.)

Regarding her employment history, Rivera testified that she elected not to work so that she could care for her son. (R. 48.)  Although Rivera further testified that she has "[n]ever worked in [her] life" (R. 48), she also stated that at one point she had a cleaning job (R. 53), but quit before completing the required training because of her supervisors' "screaming" at her.  (R. 53.)  Before ALJ Levin, however, Rivera testified that she "never worked in [her] life," and did not work as a self-employed house cleaner.  (R. 63-64.)  On December 29, 2010, Z. Griffiths interviewed Rivera at the disability field office (R. 192-200), and Rivera stated that she was self-employed as a cleaner between 1999 and 2002.  (R. 197.)  Rivera stated that she went from house to house cleaning, eight hours per day, five days per week and earned $11,524 annually.  (R. 197-98.)  The cleaning job required that Rivera walk and stand for three hours per day, sit for two hours per day and climb for one hour per day, as well as lift buckets weighing up to ten pounds.  (R. 198.)  Rivera stated that she stopped working due to a "[l]ack of work."  (R. 196.)  In a disability function report completed on January 14, 2011, Rivera also stated that at some point she worked at McDonald's, but was fired due to her difficulty with math.  (R. 202.)  Rivera testified that she would like to get a job, but she does not "like to be around a lot of people" who might scream at her and make her more

---

[1/]  Rivera's psychiatrist is identified as "Dr. Selene" in the transcript of her hearing before ALJ Hornblass, but this appears to be a misspelling of "Dr. Salim."  (Compare R. 53 with R. 362.)

nervous.  (R. 52.)  Rivera additionally testified that she had no convictions.  (R. 48.)

**Medical Evidence Before the ALJ**

### Dr. Yusuf Salim

On October 6, 2010, Rivera saw Dr. Salim for an initial psychiatric appointment.  (R. 237.)  Rivera discussed her childhood in foster care, domestic violence history, and previous depression and post traumatic stress disorder ("PTSD") diagnoses.  (R. 237.)

Rivera saw Dr. Salim again on October 19, 2010.  (R. 237.)  Rivera reported flashbacks and insomnia, and said that she tried to avoid men.  (R. 237.)  Dr. Salim noted that in 2009 Rivera had been caught selling drugs and spent forty-two days in jail at Rikers, where she was treated with Remeron with positive results.  (R. 237.)

At an appointment on October 26, 2010, Rivera reported good results with Remeron, and said that although she felt cold and clammy, she was getting enough sleep and feeling more refreshed.  (R. 239.)  On November 3, 2010, Rivera again reported sleeping well.  (R. 239.)

On November 16, 2010, Dr. Salim performed a psychiatric evaluation of Rivera.  (R. 240-46.)  Dr. Salim noted that Rivera was abandoned at birth and grew up in a number of foster homes.  (R. 240.) At ages fifteen and eighteen, Rivera was raped in the group homes where she lived.  (R. 240.)  Rivera described regularly experiencing flashbacks, insomnia, and spells of anger and crying for no apparent reason.  (R. 240.)  A mental status examination revealed an anxious and depressed affect with a sense of underlying anger and frustration, and a sad mood.  (R. 240.)  Dr. Salim found Rivera's thinking logical.  (R. 241.)  Rivera denied experiencing hallucinations.  (R. 241.)  Dr. Salim noted that Rivera had satisfactory judgment, but limited and superficial insight. (R. 241.)  Dr. Salim discontinued Rivera's Remeron prescription, and recommended a referral to group therapy for trauma victims.  (R. 242.)  Dr. Salim diagnosed chronic PTSD on Axis I,

depression on Axis II and homelessness as a stressor on Axis IV.  (R. 242.)

In a progress note dated November 16, 2010, Dr. Salim indicated that Rivera obtained a referral to a study at Columbia.  (R. 243.)  On November 23, 2010, Rivera reported a positive experience at Columbia, and that she was accepted into a PTSD group therapy program.  (R. 243.) Dr. Salim indicated that in accordance with the program requirements, Rivera's Remeron prescription was discontinued.  (R. 243.)  Dr. Salim noted that Rivera was talkative, and in a "very pleasant and optimistic mood."  (R. 243.)

At an appointment on December 2, 2010, Rivera discussed her relationship with her partner and the shelter staff's concerns that she was a victim of domestic violence.  (R. 244.)  Rivera denied any domestic violence.  (R. 244.)  Dr. Salim noted that Rivera was "well engaged."  (R. 244.)

On December 7, 2010, Dr. Salim noted that Rivera was still completing the intake process at Columbia, and was "[o]verall . . . in good spirits and positive mood."  (R. 244.)

On December 14, 2010, Rivera reported a long argument with her partner, during which he slapped her.  (R. 244.)  Due to the domestic violence Rivera was moving to another shelter.  (R. 244.)  Dr. Salim noted that Rivera was "upset but not depressed."  (R. 244.)

On December 21, 2010, Rivera reported that she and her son had moved to a new shelter and she liked its spaciousness.  (R. 246.)  Dr. Salim noted that Rivera continued to participate in the Columbia program.  (R. 246.)  Dr. Salim also noted that Rivera requested a letter "explaining her work limitations due to PTSD or criminal history."  (R. 246.)  To that end, Benjamin Rodriguez, a therapist/social worker at the Jackson Family Residence who met with Rivera weekly (R. 247, 267), drafted a letter stating:

> According to Ms. Rivera, she has been informed that it was mandatory to accept certain types of employment such as home health aide and security.  Due to her long-standing history of mental illness and imprisonment, it would be very difficult for

>her to accept the demands and responsibilities that these jobs entail. It is the understanding of the mental health team at the Jackson Residence that she would benefit from employment in the area of custodial work and retail. The task[s] that these types of jobs involve does not require her to the many demands that a security officer, for instance, has on an individual.

(R. 264.)

On January 18, 2011, Dr. Salim diagnosed Rivera with Attention-Deficit/ Hyperactivity Disorder ("ADHD"), combined type, in addition to chronic PTSD. (R. 252.) Dr. Salim noted that the new diagnosis "contributes to [Rivera's] distractibility and restlessness." (R. 252.) Rivera did not appear for several subsequent appointments (R. 256-57), and was next seen by Dr. Salim on October 24, 2011. (R. 322.) Dr. Salim noted that Rivera had been "very lax in following up with her treatment," but was "not in any acute distress." (R. 322.)

At an appointment on November 7, 2011, Rivera was "anxious and tense and rather distractible." (R. 320-21.) Rivera discussed her upcoming court date for SSI benefits, and Dr. Salim scheduled a formal psychiatric assessment. (R. 321.)

At Rivera's November 14, 2011 psychiatric assessment, she again discussed her experiences in foster care and group homes, and described being raped twice before she was twenty-one years old. (R. 301.) She reported that she began selling drugs at twenty-three and was incarcerated at thirty-five. (R. 301.) Dr. Salim noted that Rivara's affect was "anxious, depressed, appropriate" and her mood was "depressed, tense, anxious, irritable." (R. 301.) Dr. Salim observed that Rivera's thought processes were "logical but [she] does have trouble with focusing and concentration." (R. 301.) Dr. Salim noted that Rivera's insight, cognition and memory were intact, her judgment was satisfactory, her intelligence was normal and that she was moderately impulsive. (R. 301-02.) Dr. Salim again diagnosed Rivera with PTSD and ADHD on Axis I, and assessed a

GAF score of 50.[2/]  (R. 302-03.)  Dr. Salim prescribed Remeron, and further noted that Rivera was taking Lexapro for depression and should add medication for ADHD.  (R. 301, 303.)

At a follow-up appointment on December 5, 2011, Rivera continued to complain of insomnia, but reported that Remeron helped her mood and appetite.  (R. 316.)  Dr. Salim increased Rivera's Remeron dosage and prescribed Ambien.  (R. 317.)  At subsequent appointments on February 9, 2012 and March 19, 2012, Dr. Salim noted that Rivera was "pleasant," "logical," and "well related," with "[m]inimal depressive symptoms."  (R. 314, 316.)  On June 25, 2012, Rivera did not "appear depressed," was "sleeping well" and "looking to do volunteer work in her church." (R. 312.)  Dr. Salim prescribed Strattera "to address longstanding ADHD problems."  (R. 312-13.)

On October 18, 2012, Dr. Salim noted that Rivera again had missed numerous appointments.  (R. 310.)  Rivera complained of difficulty sleeping, anxiety, and restlessness.  (R. 310.)  Dr. Salim noted that Rivera never filled her Strattera prescription because her insurance "didn't cover it." (R. 310.)

At a follow-up appointment on February 26, 2013, Rivera stated that she had been without medication for several weeks.  (R. 309.)  Dr. Salim noted that Rivera "claims she is not sleeping, however, she looks healthy and fairly relaxed."  (R. 309.)  Dr. Salim again prescribed Strattera and Ambien, and discontinued Remeron.  (R. 309.)

On September 17, 2013, Dr. Salim completed a Psychiatric/Psychological Impairment Questionnaire.  (R. 362-69.)  Dr. Salim diagnosed Rivera with PTSD and ADHD, and

---

[2/]    A GAF score of 41 to 50 indicates serious impairment in social, occupational, or school functioning (e.g., no friends, inability to maintain a job).  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM) at 34 (4th ed. rev. 2000).  The Court notes that the Fifth Edition of the DSM, published in 2013, no longer uses GAF scores.  See DSM at 16 (5th ed. rev. 2013.)

noted that her current GAF score was 45.  (R. 362.)  Dr. Salim opined that Rivera had a "fair"
prognosis.  (R. 362.)  Dr. Salim's clinical findings were: poor memory, appetite and sleep
disturbance, difficulty thinking or concentrating, and intrusive recollections of a traumatic
experience.  (R. 363.)  Dr. Salim further noted that Rivera appeared "overwhelmed by all the
paperwork" and had "poor reading & writing skills."  (R. 363.)

Dr. Salim opined that Rivera was markedly limited in her ability to: remember
locations and work-like procedures; understand and remember detailed instructions; carry out
detailed instructions; maintain attention and concentration for extended periods; perform activities
within a schedule; maintain regular attendance and be punctual within customary tolerance; and set
realistic goals or make plans independently.  (R. 365, 367.) Dr. Salim further opined that Rivera was
moderately limited in her ability to: understand and remember one or two step instructions; carry
out simple one or two step instructions; sustain ordinary routine without supervision; work in
coordination with or proximity to others without being distracted by them; make simple work related
decisions; complete a normal workweek without interruptions from psychologically based symptoms
and perform at a consistent pace without an unreasonable number and length of rest periods; interact
appropriately with the general public; ask simple questions or request assistance; and get along with
co-workers or peers without distracting them or exhibiting behavioral extremes.  (R. 365-66.)  Dr.
Salim found that Rivera was mildly limited in her ability to: accept instructions and respond
appropriately to criticism from supervisors; maintain socially appropriate behavior and to adhere
to basic standards or neatness and cleanliness; and travel to unfamiliar places or use public
transportation.  (R. 366-67.)

Dr. Salim noted that Rivera was not currently on medication, and her previous
Remeron prescription had been discontinued because she was "doing well without."  (R. 367.)  Dr.

Salim indicated that Rivera might have reduced intellectual functioning but that she had not been tested.  (R. 368.)  Dr. Salim concluded that Rivera's impairments were ongoing, and likely to last more than twelve months.  (R. 368.)  In Dr. Salim's opinion, Rivera was not a malingerer, and the earliest date her symptoms applied was September 2011.  (R. 368-69.)  Dr. Salim found Rivera incapable of tolerating even low work stress due to poor frustration tolerance and noted that her impairments were likely to produce good days and bad days.  (R. 368.)  Dr. Salim estimated that Rivera was likely to miss work more than three times per month due to her impairments.  (R. 369.)

**Federation Employment and Guidance Service ("FEGS")**

On January 24, 2011, Rivera was evaluated by FEGS.  (R. 266-72.)  Rivera complained that her symptoms were: weakness, anxiety/fearfulness, depressed mood, poor concentration, insomnia and flashbacks.  (R. 266-67.)  Rivera reported that as a child she was sexually abused in foster care.  (R. 267.)  Rivera reported no history of legal problems, arrests, convictions or legal involvement.  (R. 286.)  The FEGS evaluator noted that Rivera was "cooperative, alert, oriented and coherent," as well as neat and calm with normal affect and thought content. (R. 267-68.) The FEGS evaluator further noted that Rivera had a history of "recurrent and intrusive recollections of a traumatic event that is a source of marked distress plus decreased energy, difficulty in concentration and appetite and sleep disturbance with marked restrictions of activities of daily living." (R. 267.)

The FEGS evaluator found that Rivera had normal writing and reading ability, but was unable to recall objects after five minutes, spell world backwards, or perform serial sevens. (R. 268-69.)  The FEGS evaluator's impressions were that Rivera had PTSD and depressive disorder on Axis I, a personality disorder on Axis II, and occupational and housing problems as well as problems related to social environment on Axis IV.  (R. 270.)  The evaluator noted that with respect to

Rivera's mental health problems, she was "[p]ermanently disabled from work" due to a long history of "psych care with marked restrictions of activities of daily living that prevents adherence to a regular work routine which prevents employment." (R. 270.) FEGS recommended outpatient therapy and antidepressant medication. (R. 270.)

Rivera was interviewed again by FEGS on November 18, 2013. (R. 376-407.) Rivera reported that she does not travel alone because she does not like people around her and feels people are chasing her. (R. 379.) Rivera reported that for two weeks she had been hearing voices telling her that the person who raped her was "coming to get her." (R. 382.) Rivera reported that the voices began while she was off her Remeron prescription. (R. 391.) The FEGS evaluator noted that Rivera "appears very anxious and dysphoric" but had "no evidence of thought disorder or internal preoccupations on exam." (R. 403.) The evaluator found that Rivera's work limitations were as follows: limitations on speaking, listening, writing and reading due to cognitive and educational limits; limitations on understanding, remembering and maintaining attention due to educational limits and anxiety as well as poor attention and concentration and difficulty with simple and complex tasks; limitations on tolerating stress, adapting to change, and regulating moods and emotions due to poor coping with stress; limitations on relating appropriately to coworkers and accepting supervision due to guarded and anxious behavior; and general limitations due to low energy and motivation. (R. 401.)

### Dr. Michael Alexander

On January 25, 2011, state agency psychological examiner Michael Alexander performed a consultative psychiatric evaluation of Rivera. (R. 229-32.) Dr. Alexander noted that Rivera had no history of medical or psychiatric hospitalization, but saw a psychiatrist on a monthly basis and a therapist on a weekly basis since August 2010. (R. 229.) Rivera reported that she had

"never worked because of '[her] condition.'"  (R. 229.)  Rivera complained that she had "difficulty falling asleep with some loss of appetite," but no other symptoms of depression.  (R. 229.)  Rivera reported that she was raped at age fifteen and since then has experienced "dysphoric mood, intermittent crying spells, and flashbacks," as well as auditory hallucinations in which she hears a voice saying "'I'm going to get you.'"  (R. 229.)  Rivera also reported that between October and December 2010 she was a victim of domestic violence.  (R. 229.)  Rivera told Dr. Alexander that she had been prescribed Remeron and it decreased the intensity of her symptoms.  (R. 229.)

Dr. Alexander noted that Rivera "appear[ed] to have a lifelong history of cognitive deficit, manifested in generalized limited learning ability."  (R. 229-30.)  Dr. Alexander described Rivera as "cooperative, friendly, and alert" with adequate social skills and manner of relating.  (R. 230.)  Dr. Alexander found that Rivera's expressive and receptive language were "adequate for normal conversation" and her thought processes were "[c]oherent and goal directed."  (R. 230.)  Dr. Alexander noted that Rivera's mood was "[n]eutral" and her attention and concentration were intact.  (R. 230.)  Rivera was unable to "perform simple calculations or serial 3s clearly due to limited ability with arithmetic."  (R. 230-31.)  Dr. Alexander found that Rivera's recent and remote memory skills were intact, she was able to recall three out of three objects immediately, and two out of three objects after five minutes.  (R. 231.)  Dr. Alexander noted that Rivera's "intellectual functioning is below average" with a "limited" general fund of information.  (R. 231.)  Dr. Alexander found Rivera's insight and judgment adequate.  (R. 231.)

Dr. Alexander opined that Rivera "can follow and understand simple directions" and "perform simple tasks independently."  (R. 231.)  Dr. Alexander further opined that Rivera could "maintain a regular schedule . . . learn new tasks . . . perform more complex tasks independently . . . make appropriate decisions . . . relate adequately with others . . . [and] appropriately deal with

stress." (R. 231.)  Dr. Alexander concluded that the results of the examination "appear to be consistent with longstanding psychiatric problems, which are sufficiently controlled, and in itself does not significantly interfere with [Rivera's] ability to function on a daily basis." (R. 231.)  Dr. Alexander diagnosed Rivera with chronic PTSD, noted that her prognosis was "good" and recommended that she continue psychiatric treatment.  (R. 231-32.)

### Dr. R. Altmansberger

On February 7, 2011, state agency psychiatrist Dr. R. Altmansberger reviewed the medical evidence of record, and concluded that Rivera had a non-severe anxiety-related disorder. (R. 233.)  Dr. Altmansberger opined that the evidence did not support "more than mild limitations." (R. 234.)

### Dr. Vitolo

Psychiatric medical expert Dr. Vitolo testified at Rivera's November 28, 2011 hearing before ALJ Levin.  (R. 68-69.)  Dr. Vitolo reviewed Rivera's medical records and listened to her testimony before ALJ Levin, and opined that Rivera did not suffer from an impairment that met or equaled a listed impairment because her activities of daily living were "mild to limited." (R. 69.) Dr. Vitolo concluded that Rivera was capable of low stress, simple work involving "repetitive tasks" and "one-to-two-step commands with limited social contact." (R. 69.)

### Vocational Expert Testimony

Vocational expert Melissa Fass-Karlin testified at Rivera's November 28, 2011 hearing before ALJ Levin.  (R. 69-71.)[3]  ALJ Levin asked Fass-Karlin to assume a person of Rivera's age, with elementary school education who was restricted to simple, repetitive, low stress

---

[3]     The vocational expert is identified as "Ms. Vascarlin" in the hearing transcript, but this appears to be a misspelling of "Fass-Karlin."  (Compare R. 69 with R. 121.)

work tasks involving one or two-step commands, limited social contact, and no substantial crowds. (R. 69.)  Vocational expert Fass-Karlin testified that a person with these limitations could perform the jobs of a cleaner, hand packager, meat clerk or seller of small products.  (R. 70.)  Rivera's attorney asked Fass-Karlin whether an individual with all of the limitations in ALJ Levin's hypothetical could sustain competitive employment if they were off task fifty percent of the time. (R. 70.)  Fass-Karlin testified that such an individual could not sustain competitive employment. (R. 70.)

**ALJ Hornblass' Decision**

On January 29, 2014, ALJ Hornblass denied Rivera's application for benefits.  (R. 20-37.)  ALJ Hornblass applied the appropriate five step legal analysis.  (R. 26-28.)  First, ALJ Hornblass found that Rivera "ha[d] not engaged in substantial gainful activity since November 30, 2010, the application date."  (R. 28.)  Second, ALJ Hornblass found that Rivera had the following severe mental impairments: PTSD, depressive disorder, personality disorder, ADHD by history and a learning disability by history.  (R. 31.)  Third, ALJ Hornblass found that Rivera did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (R. 31-33.)

> ALJ Hornblass determined that Rivera had the residual functional capacity ("RFC")
>
> to perform a full range of work at all exertional levels. . . . [and] the mental residual functional capacity to meet the basic mental demands of competitive, remunerative, unskilled work as defined in 20 CFR 416.968(a) including the abilities to understand, remember, and carry out simple instructions; to make simple work-related decisions; to respond appropriately to supervision, co-workers and usual work situations; and to deal with changes in a routine work setting with the additional limitation to low stress work, defined as work involving simple, routine, repetitive tasks and requiring only occasional contact with others.

(R. 33-34, fn. omitted.)

In making this determination ALJ Hornblass considered Dr. Salim's treatment notes as well as the Psychiatric/Psychological Impairment Questionnaire Dr. Salim completed on September 17, 2013.  (R. 34.)  ALJ Hornblass concluded that the degree of limitation found by Dr. Salim was not "supported by any psychiatric signs or medically demonstrable phenomena that indicate specific psychological abnormalities."  (R. 34.)  ALJ Hornblass gave Dr. Salim's opinion limited weight, because it was

> not supported by an current psychiatric signs or medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, as described by any appropriate medical source and are inconsistent with the essentially good mental status results noted on multiple examinations by Dr. Salim, the State agency, and F.E.G.S./WeCARE.  Dr. Salim's opinions are also inconsistent with his own prognosis, with [Rivera's] own statements that her medications were helping, with [Rivera's] functional activities of daily living including the care of her minor child, and with the findings of the State agency psychological CE.

(R. 34.)  ALJ Hornblass gave "no weight" to the FEGS employment disposition, "because it is an opinion on an issue reserved to the Commissioner."  (R. 34-35.)  ALJ Hornblass gave "limited weight" to the psychological consultative examiner's opinions that Rivera's psychiatric problems did not significantly interfere with her ability to function, and that Rivera's mental impairments were not severe, because "evidence received at the hearing level show[ed] that [Rivera] is more limited than determined by the State [consultative] sources."  (R. 35.)

ALJ Hornblass nevertheless gave "substantial weight" to the psychological consultative examiner's finding that Rivera has the ability to follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform more complex tasks independently, make appropriate decisions, relate adequately with others and appropriately deal with stress, because "that opinion is consistent with the medical findings of record and because it was made by an acceptable medical

source after an extensive examination of [Rivera], who has a great degree of understanding of Social Security disability programs and their evidentiary requirements."  (R. 35.)

ALJ Hornblass made a credibility determination, concluding that Rivera's subjective complaints were "credible only to the extent that they are consistent with the above residual functional capacity assessment."  (R. 36.)  ALJ Hornblass supported his credibility determination with Rivera's testimony and inconsistencies in her statements to various treating sources and state agencies.  (R. 36.)

At the fourth step, ALJ Hornblass determined that Rivera was "capable of performing past relevant work as a [c]leaner."  (R. 36-37.)  Accordingly, ALJ Hornblass concluded that Rivera was not "under a disability, as defined by the Social Security Act, from November 30, 2010."  (R. 37.)

## ANALYSIS

## I.    THE APPLICABLE LAW

### A.    Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[4/]

-----

[4/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010);
(continued...)

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[5/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[6/]

## B.     Standard Of Review

A court's review of the Commissioner's final decision is limited to determining

---

[4/]     (...continued)
Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[5/]     See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[6/]     See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

whether there is "substantial evidence" in the record as a whole to support such determination.  E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[7/]  "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"  Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[8/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[9/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence."  Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The

---

[7/]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[8/]    See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[9/]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[10/]

      The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

      The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other

---

[10/]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[11/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[12/]

**C.     The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

---

[11/]     Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774;  see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[12/]     See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010).[13]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence."

---

[13]    See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

(citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).

## II.      APPLICATION OF THE FIVE STEP SEQUENCE

### A.      Rivera Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Rivera was engaged in substantial gainful activity after her application for SSI benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  ALJ Hornblass' conclusion that Rivera did not engage in substantial gainful activity during the applicable time period (<u>see</u> page 14 above) is not disputed by Rivera or the Commissioner.  (<u>See generally</u> Dkt. No. 13: Rivera Br.; Dkt. No. 15: Comm'r Br.)  The Court therefore proceeds with the analysis.

### B.      Rivera Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Rivera proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and

remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).

ALJ Hornblass determined that Rivera had the following severe impairments: PTSD, ADHD, depressive disorder, personality disorder and a learning disability.  (See page 14 above.) Because Rivera, who is represented by counsel, does not challenge ALJ Hornblass' finding regarding the severity of her impairments (see generally Dkt. No. 13: Duran Br.), the Court proceeds to the third step of the five-step analysis.

## C.    Rivera Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Rivera had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Hornblass found that notwithstanding Rivera's multiple severe impairments, she "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments contained in the Listings in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)."  (R. 31.)

ALJ Hornblass assessed the medical evidence in the record pursuant to listings 12.02 (organic mental disorders), 12.04 (affective disorders), 12.06 (anxiety related disorders) and 12.08 (personality disorders).  (R. 32; see also 20 C.F.R., Part 404, Subpart P, App. 1, §§ 12.02, 12.04, 12.06, 12.08.)  ALJ Hornblass determined that for each of these listings, Rivera did not satisfy the

paragraph B or paragraph C requirements.  (R. 32-33.)  Because ALJ Hornblass' finding that Rivera's

impairments do not meet or medically equal the listed conditions is not disputed by the parties (<u>see</u>

<u>generally</u> Dkt. No. 13: Rivera Br.; Dkt. No. 15: Comm'r Br.), the Court proceeds with the five-step

analysis.  Before proceeding to step four, however, the Court will address ALJ Hornblass' residual

functional capacity and credibility determinations.

### 1.      <u>Residual Functional Capacity Determination</u>

ALJ Hornblass found that Rivera had the RFC to

> perform a full range of work at all exertional levels. [ALJ Hornblass] further [found]
> that despite the moderate limitations imposed by [Rivera's] severe medical
> determinable mental impairments . . . she has the mental residual functional capacity
> to meet the basic mental demands of competitive, remunerative, unskilled work as
> defined in 20 CFR 416.968(a). . . .  with the additional limitation to low stress work,
> defined as work involving simple, routine, repetitive tasks and requiring only
> occasional contact with others.

(R. 33-34.)

Rivera argues that ALJ Hornblass erred in making his RFC determination by failing

to give controlling weight to the opinion of treating psychiatrist Dr. Salim.  (Dkt. No. 13: Rivera Br.

at 7-13.)  Rivera claims that Dr. Salim's September 17, 2013 Psychiatric/Psychological Impairment

Questionnaire responses should be given controlling weight because they "are appropriate medical

findings in the context of mental impairments" (Rivera Br. at 9), and are based on "appropriate

clinical and diagnostic psychiatric abnormalities documented over a longitudinal period of time"

(Rivera Br. at 12).  This argument is unpersuasive.

Even though "the treating physician rule generally requires deference to the medical

opinion of a claimant's treating physician, the opinion of the treating physician is not afforded

controlling weight where . . . the treating physician issued opinions that are not consistent with other

substantial evidence in the record, such as the opinions of other medical experts."  <u>Halloran</u> v.

Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted).[14/]  Furthermore, "the opinion of a

treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling,"

since such statements are not medical opinions, but rather "opinions on issues reserved to the

Commissioner." Mack v. Comm'r of Soc. Sec., 12 Civ. 186, 2013 WL 5425730 at *8 (S.D.N.Y.

Sept. 27, 2013); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).[15/]  Moreover, in rejecting a treating

physician's opinion, an ALJ need not expressly enumerate each factor considered if the ALJ's

reasoning and adherence to the treating physician rule is clear.  See, e.g., Atwater v. Astrue, 512 F.

App'x 67, 70 (2d Cir. 2013) (plaintiff "challenges the ALJ's failure to review explicitly each factor

provided in 20 C.F.R. § 404.1527(c).  We require no such slavish recitation of each and every factor

where the ALJ's reasoning and adherence to the regulation are clear."); Halloran v. Barnhart, 362

F.3d 28, 31-32 (2d Cir. 2004) (affirming ALJ opinion which did not discuss the treating physician

rule, but where "the substance of the treating physician rule was not traversed").

---

[14/]     Accord, e.g., Penfield v. Colvin, 563 F. App'x 839, 840 (2d Cir. 2014); Petrie v. Astrue, 412
F. App'x 401, 405 (2d Cir. 2011); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009);
Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating
physician deserve special respect, they need not be given controlling weight where they are
contradicted by other substantial evidence in the record." (citations omitted)); Snell v. Apfel,
177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts
with the treating physician's opinion, however, that opinion will not be deemed controlling.
And the less consistent that opinion is with the record as a whole, the less weight it will be
given."); Jimenez v. Astrue, 12 Civ. 3477, 2013 WL 4400533 at *10 (S.D.N.Y. Aug. 14,
2013) ("[T]he opinions of a treating physician 'need not be given controlling weight where
they are contradicted by other substantial evidence in the record.'"); Van Dien v. Barnhart,
04 Civ. 7259, 2006 WL 785281 at *9 (S.D.N.Y. Mar. 24, 2006) ("[The] general rule of
deference does not apply where 'the treating physician issued opinions that are not consistent
with other substantial evidence in the record, such as the opinions of other medical
experts.'").

[15/]     See also, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F.
App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Cruz v.
Colvin, 12 Civ. 7346, 2013 WL 3333040 at *17 (S.D.N.Y. July 2, 2013) (Peck, M.J.), R. &
R. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014).

Thus, contrary to Rivera's assertion (Rivera Br. at 8-12), ALJ Hornblass was not required to give controlling weight to Dr. Salim's opinion, or review each of the factors in 20 C.F.R. § 404.1527(c)(2)-(6).  As required by 20 C.F.R. § 404.1527(c)(2), ALJ Hornblass gave "good reasons" for ascribing limited weight to the degree of limitations found by Dr. Salim.  (See page 15 above.)  First, it is clear that ALJ Hornblass was aware that Dr. Salim was a psychiatrist and therefore a specialist.  Further, in assessing Dr. Salim's opinion ALJ Hornblass considered (1) the fact that Dr. Salim's September 17, 2013 opinion was inconsistent with his notes spanning two years of Rivera's treatment; (2) the conflict between Dr. Salim's opinion and the observations of Rivera's examiners at FEGS; (3) the conflict between Dr. Salim's opinion and the findings of the state consultative examiners; and (4) the inconsistency between Dr. Salim's finding of marked limitations and Rivera's reported daily activities.  (See page 15 above.)  These considerations appropriately account for the factors in 20 C.F.R. § 404.1527(c)(2)-(6).

Additionally, ALJ Hornblass accurately characterized the conflict between Dr. Salim's responses to the September 17, 2013 questionnaire and the medical and non-medical evidence of record.[16]  Although Dr. Salim noted numerous "marked" and "moderate" limitations to Rivera's functioning on the September 17, 2013 questionnaire (see page 9 above), Dr. Salim's

---

[16]   It could have been helpful if ALJ Hornblass had re-contacted Dr. Salim for an explanation as to the conflict between Rivera's generally good progress notes and the marked limitations Dr. Salim indicated on the September 17, 2013 questionnaire.  Because there are no obvious gaps in the record, however, and ALJ Hornblass' determination is otherwise supported by substantial evidence, the Court will not remand on this basis.  See, e.g., Micheli v. Astrue, 501 F. App'x 26, 29-30 (2d Cir. 2012) ("The mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician."); Vanterpool v. Colvin, 12 Civ. 8789, 2014 WL 1979925 at *16 (S.D.N.Y. May 15, 2014) ("As long as the ALJ was able to weigh the evidence and make a determination as to disability, the inconsistency between the 2010 and 2011 reports and the contemporaneous treatment records did not require him to contact the treating physician for a clarification.").

treatment notes from October 26, 2012 through February 26, 2013 are generally positive, and indicate that Rivera was "well engaged," "well related," "positive" in mood, and "fairly relaxed." (See pages 5-8 above.)  On January 24, 2011, a FEGS evaluator noted that Rivera was "cooperative, alert, oriented and coherent."  (See page 10 above.)  The state consultative examiner found that Rivera was "cooperative, friendly, and alert" with adequate social skills and manner of relating, and "[c]oherent and goal directed" thought processes.  (See page 12 above.)  Rivera's therapist, Mr. Rodriguez, wrote that Rivera would "benefit from employment in the area of custodial work and retail."  (See page 7 above.)  Further, Rivera reported that she had not worked so she could take care of her son, or that she stopped working due to a "[l]ack of work" (see page 4 above), and testified that she cares for herself and her son, prepares meals and pays bills, shops and performs household chores with little assistance, and is able to travel independently (see pages 2-3 above).

Accordingly, the Court concludes that it was not legal error for ALJ Hornblass to afford limited weight to Dr. Salim's opinion.  See, e.g., Zokaitis v. Soc. Sec. Admin., 465 F. App'x 17, 19 (2d Cir. 2012) (no error in Commissioner's decision to afford little weight to the treating source statements of claimant's nurse and social worker when those statements were inconsistent with each source's progress notes); Montaldo v. Astrue, 10 Civ. 6163, 2012 WL 893186 at *15 (S.D.N.Y. Mar. 15, 2012) (ALJ's determination that claimant's treating physician's responses to a questionnaire were inconsistent with her own evaluations of the plaintiff's day-to-day activities was one of several "'good reasons'" not to give the opinion controlling weight).

Rivera's contention that it was inappropriate for ALJ Hornblass to assign "significant weight" to the findings of consultative psychiatrist Dr. Alexander also is unpersuasive.  (Rivera Br. at 10-11.)  It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions.  See, e.g., Rosier v. Colvin, 586 F. App'x 756, 758 (2d Cir. 2014)

(substantial evidence supporting ALJ's conclusion that a treating physician's opinion should not be given controlling weight included evaluations by a consultative examiner); Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995) ("The opinions of three examining physicians, plaintiff's own testimony, and the medical tests together constitute substantial evidence adequately supporting the [Commissioner's] conclusion that plaintiff's injuries did not prevent her from resuming her job as a sewing machine operator."); Fuentes v. Colvin, No. 13-CV-6201, 2015 WL 631969 at *8 (W.D.N.Y. Feb. 13, 2015) ("'The opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision.'"); Frawley v. Colvin, No. 13-CV-1567, 2014 WL 6810661 at *9 (N.D.N.Y. Dec. 2, 2014) ("The opinions of consultative examiners . . . may constitute substantial evidence where, as here, [they are] supported by the medical evidence in the record."); Leisten v. Colvin, No. 12-CV-6698, 2014 WL 4275720 at *14 (W.D.N.Y. Aug. 28, 2014).

ALJ Hornblass explained that Dr. Alexander's opinion was "consistent with the medical findings of record and . . . made by an acceptable medical source after an extensive examination" of Rivera. (R. 35.) Dr. Alexander's findings were consistent with Dr. Salim's largely positive treatment notes and opinion that Rivera's prognosis was "fair" (see page 9 above), as well as Dr. Vitolo's opinion that Rivera was capable of performing "repetitive tasks" and "one-to-two-step commands" (see page 13 above). Dr. Alexander's opinion additionally was consistent with Rivera's testimony concerning her activities of daily living and ability to follow written instructions and finish what she starts. (See page 2 above.)

An ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence. See, e.g., Rosier v. Colvin, 586 F. App'x at 758 (ALJ properly relied on evaluations by a consultative examiner to reject treating physician's opinion where other

substantial evidence in the record was inconsistent with treating physician's opinion); Rivera v. Colvin, 13 Civ. 7150, 2015 WL 1027163 at *16 (S.D.N.Y. Mar. 9, 2015) ("It is not per se legal error for an ALJ to give greater weight to a consulting opinion than a treating opinion."); Frawley v. Colvin, 2014 WL 6810661 at *5-7, *9-10 (ALJ's decision to give great weight to the opinion of a consultative psychological examiner was supported by substantial evidence because the opinion was consistent with the same medical evidence relied on by the ALJ to reject the treating psychologist's opinion); Manning v. Colvin, No. 13-CV-497, 2014 WL 5308189 at *8-9 (W.D.N.Y. Oct. 16, 2014) (ALJ properly gave little weight to the treating physician's opinion and "'great weight'" to the consultative examiner's prognosis because the consultative examiner's opinion was more consistent with the medical evidence of record); Leisten v. Colvin, 2014 WL 4275720 at *12-15 (ALJ did not err by affording treating doctor's opinions little weight and giving consultative examiners' opinions substantial weight because the treating doctor's opinion was inconsistent and unsupported while consultative examiners' opinions were supported by their examination results).

Although Rivera correctly asserts that because Dr. Alexander examined Rivera in January 2011 he did not have access to her 2011 and 2012 medical records (Rivera Br. at 11), ALJ Hornblass possessed Rivera's complete medical records including treatment notes from Dr. Salim and treating therapist Mr. Rodriguez, in addition to the opinions of Dr. Alexander and Dr. Vitolo. (See pages 5-10, 11-13 above).   "Genuine conflicts in the medical evidence are for the Commissioner to resolve."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).  ALJ Hornblass acted within his discretion in determining which parts of the various treating and non-treating physician's opinions to credit.  See, e.g., Abbott v. Colvin, 596 F. App'x 21, 24 (2d Cir. 2015).  As Dr. Alexander's opinion could constitute substantial evidence and was more consistent with the record as a whole than Dr. Salim's September 17, 2013 questionnaire responses, ALJ Hornblass did

not err in assigning it greater weight.

Accordingly, the Court finds that ALJ Hornblass' RFC determination for Rivera is supported by substantial evidence in the record.  See, e.g., Sizer v. Colvin, 592 F. App'x 46, 47 (2d Cir. 2015) (RFC determination "based on the medical opinion evidence, the objective medical evidence, and Appellant's testimony at the ALJ hearing" was supported by substantial evidence.)

## 2.    Credibility Determination

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence."  Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the

ALJ must make credibility findings.'").[17]   In addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying."  Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[18]

ALJ Hornblass considered Rivera's impairments and the extent to which they "could reasonably be expected to produce [Rivera's] pain or other symptoms."  (R. 35.)  ALJ Hornblass concluded that Rivera's "medically determinable impairments could reasonably be expected to cause some degree of the symptoms alleged," but that her "subjective complaints are credible only to the

---

[17]   See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[18]   Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

extent that they are consistent with the [ALJ's] residual functional capacity assessment."  (R. 35-36.)[19]

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[20]

---

[19]   This Court, and others, previously have criticized ALJ decisions that "[d]etermin[e] the RFC first and then measur[e] the claimant's credibility by that yardstick," as "illogical" and "prejudicial to the claimant."  Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *15-16 (S.D.N.Y. July 2, 2013) (Peck, M.J.) (& cases cited therein), R. & R. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014); see also, e.g., Hopkins v. Colvin, 13 Civ. 4803, 2014 WL 2526837 at *18 n.17 (S.D.N.Y. June 5, 2014) (Peck, M.J.), R. & R. adopted, 2014 WL 4392209 (S.D.N.Y. Sept. 5, 2014); Givens v. Colvin, 13 Civ. 4763, 2014 WL 1394965 at *10 n.18 (S.D.N.Y. Apr. 11, 2014) (Peck, M.J.); Paulino v. Colvin, 13 Civ. 3718, 2014 WL 2120544 at *17 n.18 (S.D.N.Y. May 13, 2014) (Peck, M.J.).  Nevertheless, while ALJ Hornblass' language leaves something to be desired, here unlike in Cruz, he gave sufficient explanation for finding Rivera's claim of disability to lack credibility—including careful review of the contrary medical evidence and Rivera's testimony that she is independent in her activities of daily living despite her impairments—that the Court concludes the ALJ's finding is supported by substantial evidence and a remand is not called for.  See, e.g., Hopkins v. Colvin, 2014 WL 2526837 at *18 n.17; Givens v. Colvin, 2014 WL 1394965 at *10 n.18; Paulino v. Colvin, 2014 WL 2120544 at *17 n.18.

[20]   Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, (continued...)

ALJ Hornblass properly applied this two-step process to Rivera's case.  (R. 35-36.) ALJ Hornblass assessed Rivera's credibility by considering all of the relevant medical evidence in the record in light of Rivera's statements.  (R. 31-33, 35-36.)  ALJ Hornblass found that although Rivera claimed "a <u>disabling</u> degree of intensity, persistence or limiting effects" from her symptoms, her medical record included no history of inpatient psychiatric hospitalizations or emergency room treatment, and no current psychotropic medication regimen.  (R. 35-36.)[21/]  ALJ Hornblass noted that Rivera's testimony about her daily activities included taking care of her minor son and that she stated in her Disability Report that she stopped working due to a lack of work rather than due to her impairments.  (R. 36; <u>see</u> page 4 above.)  ALJ Hornblass further noted Rivera's inconsistent statements "to and between F.E.G.S./WeCare and Social Security Administration personnel regarding her educational, employment, and incarceration backgrounds."  (R. 36.)

Rivera argues that in assessing her credibility it was inappropriate for ALJ Hornblass to consider the "unsigned, undated" disability field office report "in the face of [Rivera's] contradictory sworn testimony." (Rivera Br. at 15.)  Rivera was represented by counsel at both administrative hearings, and raised no objection to the record, including the disability report.  (R. 45-46, 58.)  Rivera does not now assert that she did not provide the information included in the

---

[20/]   (...continued)
465 F. App'x at 7; <u>Meadors</u> v. <u>Astrue</u>, 370 F. App'x 179, 183 (2d Cir. 2010); <u>Taylor</u> v. <u>Barnhart</u>, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

[21/]   In making a credibility determination, ALJ Hornblass also considered Rivera's failure to "keep up with her treatment appointments." (R. 36.)  "[W]hen considering non-compliance with treatment," however, "mental impairments require a different standard than physical impairments." <u>Belen</u> v. <u>Astrue</u>, 08 Civ. 10303, 2011 WL 2748687 at *13 n.13 (S.D.N.Y. July 12, 2011); <u>see also</u>, <u>e.g.</u>, <u>Proano</u> v. <u>Colvin</u>, No. 12-CV-4184, 2013 WL 5566105 at *4 (E.D.N.Y. Oct. 9, 2013).  Because ALJ Hornblass' credibility determination is otherwise supported by substantial evidence, the Court will not address this issue further.

report, nor does she assert that the report is inaccurate.  (See Rivera Br. at 15 ("it is unclear who completed this typed form that is unsigned").)  The employment history included in the report is substantiated by Social Security Administration employment records.  (R. 168-69, 179-84.) Morever, decisions in this District regularly have found that the information in such reports, which are completed by the claimant as part of the application for benefits, may contribute to substantial evidence in support of an ALJ's disability determination regardless of whether they are signed or dated.  See, e.g., Alves v. Colvin, 13 Civ. 3898, 2014 WL 4827886 at *11 (S.D.N.Y. Sept. 29, 2014); Laine v. Comm'r of Soc. Sec., 09 Civ. 1251, 2013 WL 2896968 at *14 (S.D.N.Y. June 13, 2013); Martinez-Paulino v. Astrue, 11 Civ. 5485, 2012 WL 3564140 at *2 n.1 (S.D.N.Y. Aug. 20, 2012).  Accordingly, the Court finds that it was appropriate for ALJ Hornblass to consider Rivera's disability report in assessing her credibility.

ALJ Hornblass also considered the inconsistencies in Rivera's statements to various treating sources, state agencies and the ALJs.  (See page 16 above.)  Rivera reported to the disability field office that she was employed for three years as a cleaner and gave a description of her duties in that role.  (See page 4 above.)  Rivera further reported that she stopped working due to a lack of work.  (See page 4 above.)  Rivera stated that she was employed by McDonald's at some point in time as well.  (See page 4 above.)  Despite this testimony, Rivera told both ALJ Levin and ALJ Hornblass that she had "never worked in [her] life" (see page 4 above), and told ALJ Hornblass that she had chosen not to work so that she could care for her son (see page 4 above).  Later in Rivera's testimony before ALJ Hornblass, she acknowledged some employment as a cleaner, but stated that she had left the position before completing training because her supervisor "scream[ed]" at her.  (See page 4 above.)  In contrast, when testifying before ALJ Levin, Rivera stated that she never did any housecleaning work.  (R. 64.)  Likewise, Rivera told Dr. Alexander that she had never worked at all

due to her "'condition.'" (R. 229.) Similarly, Rivera reported to ALJ Hornblass that she had no convictions (see page 5 above), and to FEGS that she had no history of legal involvement or arrests (see page 10 above), but told Dr. Salim that she spent forty-two days at Rikers for selling drugs in 2009 (see page 5 above).   It was appropriate for ALJ Hornblass to conclude that Rivera's inconsistent testimony lessened her credibility.  See, e.g., Diaz v. Colvin, No. 14 Civ. 2277, 2015 WL 4402941 at *15-16 (S.D.N.Y. July 19, 2015); Marquez v. Colvin, No. 12 Civ. 6819, 2013 WL 5568718 at *16 (S.D.N.Y. Oct. 9, 2013); Alachouzos v. Comm'r of Soc. Sec., No. 11 CIV. 1643, 2012 WL 601428 at *3, 6 (E.D.N.Y. Feb. 23, 2012).

Finally, ALJ Hornblass noted that Rivera's reported activities of daily living, which included shopping, cleaning, caring for her school-aged son including helping him with his homework and playing games with him, preparing dinner daily, traveling independently, paying bills and attending church, contradicted her claims of disabling psychological problems.  (See pages 2-3, 16 above.)  Thus, ALJ Hornblass met his burden in finding Rivera not entirely credible, given all the evidence before him, including the inconsistencies in Rivera's testimony, the objective medical evidence and Rivera's reports about her activities of daily living.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009) ("[T]he ALJ correctly noted that [claimant] was able to care for his one-year-old child, including changing diapers, that he sometimes vacuumed and washed dishes, that he occasionally drove, and that he watched television, read, and used the computer. Given all the evidence before him, the ALJ properly found that [claimant's] testimony about his limitations was not fully credible."); Wolfe v. Comm'r of Soc. Sec., 272 F. App'x 21, 23 (2d Cir. 2008) (claimant's testimony that "she was unable to return to any kind of work was weakened by her testimony and other representations that (1) she has learned techniques to successfully refocus her attention when she becomes distracted, (2) she goes to church about once every two weeks, (3) she

leaves her home two to three times per week, (4) she attends weekly football games, and (5) she goes shopping"); <u>Wilferth</u> v. <u>Colvin</u>, 49 F. Supp. 3d 359, 363 (W.D.N.Y. 2014) ("Plaintiff also completed an activities of daily living questionnaire wherein he stated that he performs light household chores, prepares meals on a weekly basis, washes dishes and laundry, drives his car and grocery shops, and is capable of walking up to 100 yards, lifting up to 10 pounds, using his hands without limitation, following instructions, and complying with directives from supervisors. Such activities and capabilities are inconsistent with plaintiff's claim of total disability." (record citations omitted)); <u>Aman</u> v. <u>Colvin</u>, 46 F. Supp. 3d 220, 226 (W.D.N.Y. 2014) ("The interpersonal and social limitations plaintiff . . . described [are] also inconsistent with observations by plaintiff's treating and examining physicians that she was consistently cooperative, well-dressed and groomed, and that her social interactions were pleasant and entirely appropriate."); <u>Sellie</u> v. <u>Astrue</u>, No. 07-CV-0475, 2009 WL 2882946 at *14 (N.D.N.Y. Sept. 4, 2009) (Claimant is able to "able to cook, clean, do laundry, and care for his children, and was independent with bathing and dressing. Such varied activities performed on a regular basis are inconsistent with Plaintiff's claim of total disability." (record citations omitted)).

### D.      Rivera Had The Ability to Perform Her Past Relevant Work As A Cleaner

The fourth step of the five-step analysis asks whether Rivera had the RFC to perform her past relevant work.  (See page 16 above.)  ALJ Hornblass found that Rivera was "capable of performing past relevant work as a [c]leaner" as "[t]his work does not require the performance of work-related activities precluded by [Rivera's] residual functional capacity."  (R. 36.)

ALJ Hornblass' conclusion is supported by the testimony of vocational expert Fass-Karlin, who opined that Rivera could work as a cleaner.  (See pages 13-14 above.)  Fass Karlin further testified that Rivera could perform other unskilled jobs, including as a hand packager, meat

clerk or seller of small products.  (See page 14 above.)

ALJ Hornblass' finding that Rivera could perform her past relevant work as a cleaner as generally performed is sufficient to negate a finding of disability at step four.  See, e.g., Thomas v. Colvin, 14 Civ. 7206, 2015 WL 4567400 at *16 (S.D.N.Y. July 30, 2015) (Peck, M.J.) ("ALJ Miller's finding that [claimant] could perform his past relevant work as a cook as generally performed is sufficient to negate a finding of disability at step four."); Alfaro v. Astrue, 09 Civ. 3756, 2011 WL 6259132 at *8 (S.D.N.Y. Dec. 6, 2011) ("Given that the vocational expert 'testified that a claimant with the above-mentioned residual functional capacity could perform work as an office clerk [and] light SVP 3 work,' the ALJ concluded that [plaintiff] is likewise capable of performing her past relevant work as an office clerk.  The ALJ noted that her work 'does not require the performance of work-related activities precluded by the claimant's residual functional capacity.'  Therefore, the ALJ determined that [plaintiff] was not disabled under the Act and did not qualify for SSI benefits." (citations omitted)).

Rivera contends that her earnings as a cleaner between the years 1999 and 2002 were insufficient to qualify as "substantial gainful activity."  (Dkt. No. 13: Rivera Br. at 15-16.)  When evaluating whether work constitutes substantial gainful activity, the SSA's primary consideration is a claimant's earnings from work activity.  See 20 C.F.R. § 416.974(a)(1).  In 2001, average monthly income in excess of $740 per month, or $8,880 per year, presumptively indicated substantial gainful activity.  (See SSA Substantial Gainful Activity, https://www.ssa.gov/ oact/cola/sga.html (last visited Dec. 8, 2015).)  In 2002, average monthly income in excess of $780 per month, or $9,360 per year, presumptively indicated substantial gainful activity.  (Id.)  In 2001, Rivera earned $11,524, and in 2002 she earned $10,621.  (R. 168, 179.)  Accordingly, Rivera's work in 2001 and 2002 presumptively indicates substantial gainful activity.

Because Rivera did not meet her burden of proof on the fourth step of the analysis, the Court is not required to advance to the fifth step.  See 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.").[22/]  Nevertheless, assuming arguendo that Rivera had no past relevant work as a cleaner, vocational expert Fass-Karlin's testimony as to available jobs that Rivera could perform (see pages 13-14 above) satisfies the Commissioner's burden at the fifth step.

[22/]    Accord, e.g., Thomas v. Colvin, 14 Civ. 7206, 2015 WL 4567400 at *16; Paulino v. Colvin, 13 Civ. 3718, 2014 WL 2120544 at *20 (S.D.N.Y. May 13, 2014) (Peck, M.J.); Garner v. Astrue, 08 Civ. 6367, 2009 WL 903742 at *19 (S.D.N.Y. Apr. 6, 2009) (Peck, M.J.), R. & R. adopted in part, 2009 WL 1911744 (S.D.N.Y. June 30, 2009); Gibbs v. Astrue, 07 Civ. 10563, 2008 WL 2627714 at *25 (S.D.N.Y. July 2, 2008) (Peck, M.J.), R. & R. adopted, 2008 WL 4620203 (S.D.N.Y. Oct. 16, 2008); Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Papp v. Comm'r of Soc. Sec., 05 Civ. 5695, 2006 WL 1000397 at *16 (S.D.N.Y. Apr. 18, 2006) (Peck, M.J.); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *15 (S.D.N.Y. July 8, 2003) (Peck, M.J.), R. & R. adopted, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963 at *11 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.) (citing Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Velk v. Shalala, 93 Civ. 3111, 1995 WL 217516 at *5 (S.D.N.Y. Apr. 11, 1995)).

**CONCLUSION**

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings (Dkt. No. 14) is GRANTED and Rivera's motion (Dkt. No. 12) is DENIED.  The Clerk of Court shall close the case.

SO ORDERED.

Dated:      New York, New York
            December 18, 2015


_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to: All Counsel